Please be seated. And will you call the next case, please? 3-12-0915, People of the State of Illinois, Affiliate by Robert Hanson v. Charles McRae, Appellant by Emily Wood. Ms. Wood? Thank you. Good morning or afternoon, Your Honors. Isn't it awful that we can smell the lunch cooking? You know, I was warned about that, and I've got to say, if you hear my stomach rumbling, just kind of ignore it. We're all on the same boat. May it please the Court, my name is Emily Wood. I am from the Office of the State Appellate Defender on behalf of Charles McRae. Nobody here in this case disputes that Charles McRae is mentally ill. He has suffered from bipolar disorder since he was 12 years old. And nobody disputes that Charles responds well to treatment, and that when he's stabilized, he can be productive and responsible. And finally, nobody disputes that although the trial court found him guilty but mentally ill, the judge did not favorably consider Charles' mental illness in sentencing Charles to an extended term sentence of 45 years, which is 39 years over the minimum and 15 years over the maximum. Now at trial, the evidence demonstrated that both experts basically agreed that Charles committed this offense while he was suffering from an active mental illness resulting in a substantial behavior disorder with impaired judgment. We also know that he repeatedly tried to kill himself around the time of the offense. He also repeatedly asked police officers to kill him as well. By the time Dr. Witherspoon was able to examine him with respect to whether he was fit for trial, he was floridly psychotic. Now significantly, even though Dr. Hillman, the state's expert, saw Charles months after he was already stabilized, he could still acknowledge, he still knew, that Charles had suffered, his mental illness was acute at the time of the offense. Now based on all of this, the trial court found Charles guilty but mentally ill, yet almost immediately after, the trial court backed away from Charles' mental illness and the significant factor that that played in the offense and started to make comments suggesting that he thought Charles was malingering or sort of faking it. And comments to the effect of, and these are rough quotes, I notice that the defendant has become brilliant since trial. His mental health issues have dissipated and his IQ popped up 300%. The defense counsel responded, well his medications are working well, your honor. And the court said, well, it's magical, and I'm a little bit chagrined because we've got a guy with serious charge here and lots of mental health in his background, and two days after trial he becomes brilliant. Now the trial court's comments show not only a confusion between mental illness and intelligence, which we know can both coexist at one time, but at the very least they also show the trial court's eagerness to distance itself from the mental illness as a significant factor in the offense. And at worst, at most, it shows the trial court's belief, erroneous belief, that Charles was somehow faking it. Now these comments continued at sentencing where the trial court said, oh, Charles suffered from a memory loss just until shortly after he was found guilty. From the first court date he looked like he was almost comatose. When he came back from Chester Mental Health Facility he still looked like a bland piece of dough, and shortly after conviction he was miraculously restored. Now these comments are not well-founded based on the evidence that we know came out at trial. He looked comatose at the first trial date because he was unfit for trial. In fact, he was floridly psychotic. His memory loss was also real. His memory didn't suddenly become restored after his conviction. He still couldn't remember, even at the time of sentencing. And we know from both experts that this is very common with people who suffer from severe psychosis. And in fact, even people without mental health issues can have memory problems if they go without sleep for several days, as we know Charles did. Was this Charles' first offense? No, no. And he does have a history. Second? No. Third? No. Fourth? No. No. So in addition to this, can even the psychotic and the judge consider the safety of the public and his fellow's history of maybe not taking his meds once he's not being supervised and the risk that poses to the fine citizens of Rock Island County? Sure, but we need to be careful in parsing out exactly what the trial court said. The trial court is absolutely able to consider his prior criminal history. That is completely undisputed. And he does have a history. But when the trial court talked about needing to protect the public, he talked about it in terms of the fact that Charles never expressed any remorse for the commission of the offense. And the reality is that he had no idea what happened during that time because he never actually recorded into his memory banks. Well, it says you, and then he says his expert, but does the judge have to believe that? He found to believe that? Well, we know that the judge not only credited Dr. Witherspoon, who is the defense expert, but he also found him guilty of a mental ill. So the judge clearly recognized that Charles was operating under a severe mental illness at the time of the offense and ultimately did not find that it released him from culpability by an insanity defense. But we know that a factor in mitigation is if you have a defense that maybe doesn't lead to the ultimate excuse from committing the offense, we know that you can still consider those factors in mitigation. So maybe if you have a self-defense claim, you ultimately, the trier of fact ultimately does not find that it's a true self-defense, thereby excusing you from any sort of liability or criminal culpability, but they can consider the provocation, they can consider the nature of the self-defense claim as mitigation for sentencing. And here, that's exactly what should have happened, but I think by the trial court's comments, it's clear that it did not happen. Again, we know that Charles does need to be medicated permanently, but to comment  until he was convicted and then all of a sudden he was magically restored, I mean, really, what we're talking about here is his behavior after he was convicted indicates one thing, and that's the one thing that we're pushing here, which is that he responds well to medications, and that is what he needs. And yes, he has a history of being noncompliant, but he has a history of not being, of trying, trying to be compliant, not being able to afford. This was the third armed robbery, right? Yes, yes. He does have two armed robberies in the past, and we do acknowledge that the recidivist statute could eventually catch up to him, but we also know that Dr. Witherspoon, who is the defense expert, said, opined that he didn't think that this offense would have happened at all if he had been able to have access to his medications and been stabilized. And both experts, both the states. So what? I mean, really, I mean, if what happened, then isn't that admission that it's probably likely to happen the next time he's off with medicine? Well, not necessarily. I mean, we know that the stressors that he faced this time around were particularly acute. He had a very ill pregnant girlfriend who then gave birth to his daughter, who was also very ill, I believe required hospitalization. He was unable to care for her other children. She was unable to work. All of these, you know, he was unable to afford his medications. He was falling down a slippery slope, despite the fact that he had tried to get help. In the past, it hadn't been so bad, in his words. He was able to either, you know, cope through different mechanisms or even self-medicate through other means. Well, but in some ways he coped with committing armed robberies, right? Well, I certainly don't know the circumstances around that. I believe that 2001 or 2002 he had some armed robberies. 2002, there were two armed robberies. And I don't know the circumstances around that, whether they were also fueled by his mental illness being acute. I don't know that. I do know that this particular offense was fueled by his acute mental illness. And I also know that the facts around this offense were not particularly egregious, such that it would justify a 45-year sentence. Well, what about the mad drive in the car? I'm sorry? What about the mad drive in the car? With the chase, yes. And absolutely, again, the court can consider this. But again, when we look at the trial court's comments, he's focused on his newfound belief that Charles might be faking it. But maybe he put one over on the trial judge, just that, you know, with repetition of his comments, like, oh, you know, at first you had mental health issues, at first you had memory loss, and here you are all of a sudden a healthy participant in your post-trial issues. Those are the comments that are particularly concerning, and they rise to a level of abusive discretion, because it not only demonstrates an unwillingness to consider his mental illness as a factor of mitigation, but it's actually indicating that he's using the fact that Charles has since stabilized against him, which is not what we want to do when we fashion a sentence. We want to fashion a sentence with respect to the seriousness of the offense, with respect to... He wasn't on medication before the trial? No. He was found unfit, I believe it was in August... He was found unfit at the time of trial. He was not on medication? Oh, I'm sorry, at the time of trial, yes. And he was stabilized? And he was stabilized, yes. And he was stabilized in sentencing? Yes. And the judge made comments that those... he looked like a different person at those events than he did two days after the sentence. Right, because what had happened during that time is, during trial, he was exercising his Fifth Amendment right to remain silent, and also his Sixth Amendment right to counsel, to have counsel assist him in holding the state basically to their burden. And then... But the judge got to see him in the courtroom and observe his demeanor and his aspect, at least to the extent of him sitting at all, but he got to observe the gentleman in his courtroom, right? Sure. Sure. Absolutely. Now, the state, in their brief, does not really address the lack of mental illness as a factor in the sentencing. Instead, the state sort of focuses on the fact that, well, Charles's sentence, as this court has pointed out, the sentence is appropriate because of his background and because of the nature of the offense. And this argument really ignores three things that I would like to put forward. First, it ignores the fact that Dr. Witherspoon, again, opined that it wouldn't have happened if he had been stabilized. But perhaps more importantly, two and three... No, I was bothered by that. Is that medical opinion, that something would not have happened if he had been medicated? I mean, I think that it goes to his state of mind, his ability to control himself at the time of the offense. No, but I mean, he's not talking about, it seems to me, that wasn't a medical opinion, that was a conjecture that the crime wouldn't have happened. You know, people can be on medicine and the crime still happens. Sure. I mean, you know, so it didn't strike me that that was an expert opinion. That was conjecture by this person that it wouldn't have happened if he was on his meds. Sure. You see where I'm coming from? I do, I do. That wasn't a medical opinion about his state of mind or that, you know. Right. And to be honest, I don't know what the trial court did with it because although the trial court did favor Dr. Witherspoon in terms of his better handling of facts, I think he thought that there was a more comprehensive examination performed by Dr. Witherspoon than the state's expert. You know, you're right. That is Dr. Witherspoon's opinion. I'm not sure if it would qualify as a strict medical opinion and the trial court can consider it or not. I mean, the trial judge here appeared to just think that this defendant was very manipulative after watching the performance. Yes. Yes. And that's the ultimate sort of conclusion that the trial court came to. But I don't think that although he is able to examine the defendant, observe the defendant throughout the trial proceedings, what we have is two experts, including the states, who wholeheartedly agree that Charles is severely mentally ill, that he committed this offense while his mental illness was acute. And what we're talking about is disease of the brain, of course. So regardless of, you know, what was going on at trial, while Charles was remaining silent, as he probably should be, during a criminal trial, to completely throw away both experts who thoroughly examined within their field of expertise, just in favor of some observations that we don't really have the full story, I mean, that tends to... Well, how is that throwing away their opinions? In other words, even if we have somebody who is mentally ill, as you said, a disease of the brain, we still don't let them run around the street terrorizing people, right? And so even acknowledging that this person is mentally ill at the time, by sentencing them and saying this guy's a risk, we could pass his, you know, unlike the markets, maybe past performances, an indicator of future results. And that's not unreasonable. So the fact that the judge decides, because of his lapses in the past on and off medication, and what he does, as the experts tell me, what he's prone to do when he's off of medication, is this sentence is not an indication that the judge threw away those opinions of those experts. Well, and we have two additional factors, and this will answer your question, or this is my answer to your question. We have two additional factors that we know went into the sentence. First, both the state and the trial court promised that an extended term sentence was off the table. Now, the state disputes that this promise was made, but I think a normal reading of this conversation that happened on the record, shows that the defendant, Charles, asked about the upper limits of his possible sentence, and the state, who knew all the aggravating factors at the time, even pre-trial, did not just tell him he was seeking an extended term. And in fact... He said max. Did they say extended term, or did they say you won't be sentenced above the max? They talked about the term, the range, in terms of mandatory. Which, I mean, really any reasonable reading of mandatory, we know there are two sentence ranges, the mandatory and the permissible. And when you're referencing... Thank you. When you're referencing mandatory term, we think the 6 to 30, which is associated with the Class X felony, which, of course, this home invasion was. We know that the state's attorney is more than capable of differentiating between a mandatory versus a permissive sentence, because the state's attorney later referred to discretionary consecutive sentences as opposed to concurrent. The third thing is that, again, there's nothing in this offense that justifies a 45-year sentence. Home invasions are scary, absolutely, and that is exactly why it is a Class X offense with a range of 6 to 30 years. But in this home invasion, there were no threats. There was no harm to anyone except for himself later on. He did not even touch the people in the house. And while the offense lasted 10 minutes, it was full of bizarre behaviors, such as Charles asking and drinking a glass of water. He asked for the phone, then put it back in Hannah's purse. He then left the house, took off his shirt, tore it up into pieces, put his hands in prayer position, and then took off. Again, treatment is warranted, not a sentence of 39 years over the minimum and 59 years over the maximum. And we would ask this court to remand for a new sentencing hearing or reduce the sentences on all counts to non-extended terms. Thank you. Mr. Hanson. Good afternoon, Your Honor. May it please the court, counsel. At the outset, we would note that the judge, after making a reference to the defendant's apparent post-trial improvement in his mental state, said he wasn't concerned with that regarding sentencing. He specifically said, I'm not relying on that in sentencing, but rather on other factors. Turning now basically in order to the points counsel made in the brief, the defendant was never promised no sentence beyond the quote-unquote normal maximum. That was 6 to 60 with the intended term for Class X factored in. There was simply no promise. There would be no extended term, just a promise he couldn't be sentenced beyond the legal maximum. And indeed, no detrimental reliance is claimed of any type here. It's not claimed the defendant did or didn't do something or claimed that he would have done something differently had he thought that he could not get something beyond the basic maximum sentence without taking the extended term aspect into consideration. Is there a context, though, for that conversation? It was in the context of the prosecutor saying, we're going to offer some other crimes evidence of uncharged offenses. Yes, that's completely correct. And then the defendant says, wait a minute, wait a minute. Am I going to get more because of those offenses? Judge, look at the record. I think it favors us. You're absolutely correct that that's in there. But look at the whole record, which we cite, and God knows him in our brief. And yes, that was part of it. But the judge told the defendant he would not be sentenced beyond the maximum allowable sentence. He never talked about tiers of sentence. He said not below the maximum lower tier, as opposed to upper. He said that. The state's attorney had said, and this is getting to your point, Your Honor, she would present two other crimes in aggravation. Defendant asked if proving the other crimes in aggravation allowed a sentence, quote, past the mandatory maximum sentence. The judge said he couldn't go beyond the mandatory maximum. No discussion of what that was. The assistant state's attorney said she would prove up a pending crime, dismiss it when the defendant was sentenced. Also said she'd prove up another armed robbery. She said she would never seek a sentence higher than the maximum. The judge told the defendant he would consider other crimes in aggravation, never told him he'd get no sentence beyond the, quote, unquote, normal statutory sentencing range. Just told him no sentence beyond the maximum. The defendant's claim is unavailing that, of course, there is no sentence beyond the discretionary extended term. That's a claim the defendant points out in his brief. The defendant didn't know that until the judge told him. Specifically, he wouldn't be sentenced beyond the maximum. Judge, look at the language in the record. I think it favors it. Well, this wasn't a plea, correct? Correct. This was after conviction, at trial. So let's just suppose the judge, assuming there was a promise, what was the quid pro quo for the promise? There was none. That kind of gets my original point of no detrimental reliance. None. Nothing. No consideration, no quid pro quo, no whatever. Well, if you go to trial, you won't get more than the maximum. Mandatory. And that's always true? Yeah. There was no abuse of discretion here, which is, when you really look at it in the largest sense, what the defendant's claiming. All the factors of law are set out in my brief. The appellate court presumes the judge considered the mitigating factors. The defendant, on oral argument and indeed in brief, kind of minimizes, as I guess I would, too, where I'm in that position, what this defendant's background was. And keep in mind the rehabilitation potential, which I would argue in essence was about zero here, can nonetheless be outweighed by the seriousness of the crime and the need to protect the public. Obviously, the need to protect the public is massive here. Lack of remorse, which was here, can be considered. Prior drug use, which was here, is an aggravating factor. Essentially, there was very, very, very little in the defendant's favor. He committed this crime on April 22nd of 2010. On April 19, 2010, he robbed another store with a knife. On April 21, 2010, he robbed yet another store with a knife. There was a pending case in Iowa around the same time involving burglary, robbery, and kidnapping. The defendant was a menace. No comment more than that's necessary. It's all in my brief. He had an extensive prior record, including two armed robberies with a firearm. That's set out basically up page six of my brief. The judge was pretty thorough in what he said in sentencing this individual. He said this is one of the worst records he's seen. He noted the two prior armed robberies with a firearm. He noted the instant armed robbery was one of three with knives. He noticed the defendant showed no remorse. He said the defendant just wasn't aware of the harm he caused society and that the judge had to protect the public. He noted the defendant drove like a maniac, judge's words, not mine, in flight away from the scene, presenting a great danger to many people. Again, I made the point. He said he wasn't concerned with his post-occurrence mental change. He found the defendant to be manipulative and callous, and so there was a need to deter. What we have here, Your Honors, is a perpetual armed robber who's now added home invasion to his repertoire. There's no reasonable question here of the judge abusing his discretion, Your Honors. He could have gotten up to 60. 45 was richly deserved given who this defendant was. Thank you. Thank you, Mr. Hanson. Ms. Wood, some rebuttal. Thank you again, Your Honors. Just a couple of points. First is we're not arguing that there's any sort of guilty plea detrimental reliance based on the promise that the court and the state would not seek an extended term. And so we're using that as evidence that demonstrates those comments demonstrate or help to demonstrate the later arbitrariness of the 45-year sentence. When you look at that conversation, and, again, we both agree that this is laid out in, I believe, pages 522 through 524-ish of the record, we're using words like normal sentencing range, mandatory sentencing range, not discretionary, not optional. The 6 to 30 is what a reasonable interpretation of the conversation lends itself to. And, again, to then jump to a 45, of course, Charles has no rights to detrimentally rely or do anything based on this promise except that when he later gives him 15 years extra over the maximum, that shows an arbitrariness, especially when it is also coupled with comments on Charles's post-trial change, in quotes. And although, you know, counsel points out that the judge also made a comment that he's not going to consider this change, he clearly did. He then later, while he's sentencing him, makes several comments about what he perceives Charles's change in his mental health to be. So for all of those reasons, we would ask, again, that this court either reduce his sentence to the mandatory, which is the 30 maximum, or send it back for resentencing. Thank you. Thank you, Ms. Wood. And thank you, Mr. Hanson. And also, this matter will be taken under advisement, that written disposition will be issued, and right now the court will be in recess until 1 p.m. The court is now in recess.